**ECF CASE**

Sarah L. Reid
Paul F. McCurdy
**KELLEY DRYE & WARREN LLP**
101 Park Avenue
New York, New York  10178
Telephone:  (212) 808-7800
Facsimile:  (212) 808-7897

11 CV 9247

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOODRICH CAPITAL, LLC and WINDSOR SHEFFIELD & CO. INC. <br><br> Plaintiffs, <br><br> v. <br><br> VECTOR CAPITAL CORPORATION, <br><br> Defendant. | Case No.: <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Goodrich Capital, LLC ("Goodrich Capital") and its affiliate, Windsor

Sheffield & Co., Inc. ("Windsor")(collectively, "Plaintiffs" or "Goodrich") by their attorneys,

Kelley Drye & Warren LLP, alleges as follows:

### NATURE OF THE ACTION

1.      This is a civil action for breach of contract.  Defendant Vector Capital

Corporation ("Vector" or "Vector Capital") has used confidential information for its own benefit

in breach of the Confidentiality and Non-Disclosure Agreement ("NDA") entered into between

the parties.  Vector Capital has also breached the NDA by excluding Goodrich Capital and the

Treasurer, the third party to the NDA, from its acquisition of the Sentinel product line owned by

Tidel.  Plaintiffs seek damages for Vector's breaches of the NDA.

## PARTIES

2.       Goodrich Capital, LLC is a limited liability company organized and existing under the laws of the State of New York with its principal place of business located at 52 Vanderbilt Avenue, New York, New York.

3.       Windsor Sheffield & Co., Inc. is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business located at 489 Devon Park Drive, Wayne, Pennsylvania.

4.       Upon information and belief, Vector Capital Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1 Market Street, San Francisco, California.

## JURISDICTION AND VENUE

5.       This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332, in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

6.       Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that Vector Capital is subject to personal jurisdiction in this District based on its substantial and regular business activities in the District and based on its consent to personal jurisdiction, as set forth in the Confidentiality and Non-Disclosure Agreement described herein, to the jurisdiction of the state and federal courts in the State of New York for the adjudication of any dispute arising from such Agreement.

## FACTUAL BACKGROUND

7.       Goodrich Capital is in the business of advising small and middle market companies in identifying, developing and implementing strategic transactions.

8.      Goodrich Capital brings a unique value to transactions stemming from its extensive operating background in business development and financial planning. This enables Goodrich Capital to more broadly identify strategic opportunities, enhance recognition of its client companies' strategic and market value and create broad transaction appeal. This operating experience has created access to an extensive base of corporate relationships for partnership, joint venture and acquisition opportunities to create new or expanded commercial platforms.

9.      Goodrich Capital is affiliated with registered securities broker/dealer Windsor Sheffield & Co., Inc.  Windsor is a firm that provides comprehensive high investment management, capital raising, and management advisory services. Wesley Frith, a managing partner of Windsor, serves as an advisor to Goodrich Capital.

10.     In late 2009, Goodrich was retained by Richard Irvin as an advisor for a possible transaction involving Irvin's new cash management business, The Treasurer (hereinafter "Treasurer"), which is targeted to the retail sector which uses safes to hold daily cash receipts.

11.     Windsor, as Goodrich's affiliate, was also retained by Richard Irvin as the broker/dealer to work with Goodrich in raising capital for Treasurer.

12.     The Treasurer is a proprietary fully integrated system uniquely reduces cash handling costs for small and mid-size retailers and is designed to fill a unique market void, providing an alternative to traditional and cumbersome retail cash handling methods.  A smart safe, safes with a software capacity, is one component of Treasurer's total solution.

13.     Goodrich formulated the strategy to purchase an established smart safe company to serve as the platform company enabling the Treasurer to control the total customer experience and also allowing the Treasurer to build out future software features as a further product enhancement.

14.     In the fall of 2010, Irvin and Goodrich identified and secured the interest of Corporate Safe Specialists ("CSS") to be the platform company for the Treasurer system. In concert with the owners of Treasurer, Plaintiffs arrived at a term sheet and a transaction value of $60 million.

15.     Windsor began searching for a potential sponsor to finance the acquisition of CSS and funding of working capital for Treasurer. As part of that effort, Wesley Frith contacted Vector Capital to determine its interest in pursuing the Treasurer-CSS deal.

16.     Vector Capital indicated it was interested and, on November 11, 2010, Vector Capital entered into a Confidentiality and Non-Disclosure Agreement ("NDA") with Goodrich Capital together with its affiliates and Treasurer. Upon information and belief, Vector Capital had no prior knowledge of the cash management industry for the retail sector before it entered into the NDA.

17.     The executed NDA is broad and covers not only the Treasurer-CSS deal but any deal involving a company similar to CSS. The second paragraph of the NDA specifically provides that the "Contemplated Business Arrangement" is in regard to a new business opportunity related to a "cash handling services" project. A copy of the NDA is attached hereto as Exhibit 1.

18.     Among the provisions that the parties bargained for in the NDA, the most pertinent safeguards are included in Sections 2, 3 and 5. They provide:

> 2.     Scope of Use: Recipient shall not use any portion of the Confidential Information of Discloser except to the extent reasonably necessary to explore the Contemplated Business Arrangement. Recipient shall make no other use of the Confidential Information or any portion thereof or any of the related materials and documents furnished by Discloser at any time. Recipient shall not at any time incorporate any portion of the Confidential Information into any other work or product except to

4

the extent reasonably necessary to explore the Contemplated
Business Arrangement.

3.    Definition of "Confidential Information":  For the purpose
of this Agreement, the term "Confidential Information" shall mean,
with respect to Discloser, any and all non-public information,
including without limitation, concepts, plans, business plans,
proposals, projections, trade secrets, financial information, data
(sales, cost or otherwise), designs, memoranda, know-how,
technology, proprietary information, reports, test results, process
flow diagrams, customer and supplier lists, notebooks, software in
any stage of development, samples, specimens, formulae, models,
prototypes, tools, equipment, drawings, and/or any other material
or information, whether technical or non-technical, that may be
furnished or made available by Disclosure to Recipient, including
any Confidential Information that may have been disclosed or
made available prior to the execution of this Agreement, and all
reports, summaries, compilations, analyses, notes or other
information that are based on, contain or reflect any such
information.  All information meeting the foregoing definition
which is provided for purposes of the Contemplated Business
Arrangement, whether provided in tangible form, by electronic
media, by visual display or orally, shall be considered to be
Confidential Information for purposes of this Agreement, provided
that (i) in the case of information provided in tangible form, by
electronic media or by visual display, it is marked with, or
accompanied by, the legend "CONFIDENTIAL"...

5    Non-Circumvention:  Neither party shall seek, in violation
of any agreement between the parties entered into after the date
hereof with respect to the Contemplated Business Arrangement, to
circumvent, avoid, bypass or obviate the other party, either directly
or indirectly, to avoid payment of fees or other compensation or to
exclude the other party or minimize its role, in any transaction or
business opportunity identified by the parties, and as described in
any such agreement.

19.    The purpose of the NDA is to facilitate a free flow of protected

information between the parties.  Goodrich spent substantial time and resources helping to craft a

business strategy for the Treasurer-CSS deal, including adding the platform component and

analyzing its potential for growth and market competition.  Goodrich prepared a presentation

deck for potential investors of its qualitative and quantitative analysis of the business structure,

which included non-public, confidential information relating to the Treasurer-CSS deal, including but not limited to: the investment opportunity in the relevant industries, the basis of the integrated business strategy, strategic growth opportunities, competitor information, potential customer information, and proprietary information concerning existing cash management systems and safe companies, as well as the combination thereof, and analysis of the forgoing.

20.     In accordance with the terms of the NDA, Goodrich Capital designated the Treasurer-CSS presentation deck as confidential, on the front cover.  The confidential designation also covered related oral discussions.

21.     At Vector Capital's request, the presentation deck, and a financial model, were sent to Vector Capital on January 14, 2011.  Upon information and belief, Vector Capital had no prior knowledge of the confidential information contained in the presentation deck as well as no understanding of retail cash management and the use of smart safes in that market.

22.     The presentation deck outlined the landscape of the current marketplace in the relevant industries, how current cash management was handled with traditional safes and smart safes, how the Treasurer system would alter retail cash management, provided a revenue model, and business strategy, including the role of intellectual property and customer care.

23.     The presentation deck also outlines the sources and uses of the funds procured to finance a safe company acquisition.  Among the line items listed is "Transaction Fees (Goodrich and other)" in the amount of $3.5 million dollars.

24.     The parties to the NDA understood that, if Vector Capital financed a deal involving a platform-Treasurer type business model, that Goodrich would be compensated upon consummation of the transaction, as is typical in the industry.

25.     Shortly after receiving the presentation deck, on January 18, 2011, Amish Mehta and Alex Beregovsky, the primary contacts at Vector Capital working on the deal, made a site visit to CSS.

26.     In a post-visit dinner attended by the principals of Treasurer, Goodrich, and Vector, the Vector representatives stated they would not be interested in a smart safe company as a stand alone without the involvement of Treasurer and the business model presented.

27.     A few weeks later, on February 9, 2011, Alex Beregovsky e-mailed Robert Albus, President of Goodrich Capital, and Wesley Frith, the terms of Vector's proposal for the acquisition of CSS.  Among the terms, Vector Capital stated "we will pay the Goodrich fee and shoulder the transaction expenses."

28.     Earlier that month, CSS had received a competing offer from Pfingsten Partners, LLC which CSS ultimately accepted at the end of February.

29.     Upon hearing of the acquisition, Wesley Frith and Alex Beregovsky set up a conference call among the parties to the NDA.  On the February 22, 2011 conference call, Plaintiffs, the principals of Treasurer, and Vector Capital agreed to work together to find a replacement platform company.

30.     The Treasurer-CSS presentation deck had identified Tidel as a manufacturer of smart safes.  On February 24, 2011, Robert Albus contacted Tidel's chief executive, Mark Levenick, to request a meeting and to ascertain whether Tidel had interest in being considered as the platform company for the Treasurer deal, as a replacement for CSS. Goodrich Capital was the party to the NDA that identified the Tidel opportunity.

31.     On March 1, 2011, the principals of Treasurer and Goodrich Capital met at Tidel's offices in Dallas, Texas to discuss the potential acquisition of Tidel. Tidel executives indicated that they were interested. At that time, Tidel had two product lines, the Sentinel line of smart safes, and another product line, Revolution, used by banks for cash management..

32.     Upon information and belief, Vector Capital independently visited the Tidel management team in Dallas the following week.

33.     Thereafter, Vector Capital surreptitiously began preparing an offer to acquire all of Tidel's assets. Vector Capital never once involved, let alone notified, Treasurer or Goodrich of its attempt to acquire Tidel alone, in breach of the NDA.

34.     On March 30, 2011, Mark Levenick advised the principals of Treasurer and Goodrich that the chief executive of Laurus Capital Management, LLC ("Laurus"), the owner of Tidel, had rejected a Vector Capital offer earlier that week for an acquisition of all of Tidel's assets. Levenick further stated that he was unable to divulge the details of the offer, but did say that Vector had been in their offices for most of March preparing the offer and doing due diligence. Prior to March 30 2011, Plaintiffs had no knowledge of Vector's offer.

35.     Vector Capital never disclosed to Goodrich or Treasurer that they had made such an offer, or that it had been rejected.

36.     Beginning in April and continuing through July, Goodrich spent a substantial amount of time and resources attempting to construct a deal with Tidel by creating a structure which would be viable and attractive to all parties. Goodrich ultimately proposed a deal structure where only the Sentinel product line of Tidel, the line which would support Treasurer, would be included in the overall transaction.

37.    Plaintiffs also had several meetings with Pinebridge, a private equity firm that was interested in providing the structured finance piece for any deal.

38.    In late July of 2011, Goodrich had in place all the elements for a Treasurer-Tidel deal. Wes Frith contacted Vector Capital and informed them that he believed a deal with Tidel for purchasing the Sentinel line only as the Treasurer platform was feasible and wanted to set up a meeting between Goodrich, himself and Vector. The purpose of the meeting was for Goodrich to present the different deal structure and financing it had identified and developed.

39.    Vector Capital expressed strong and immediate interest in pursuing the deal based on buying Tidel's Sentinel product line as support for Treasurer.

40.    On August 3, 2011, Goodrich circulated a Vector Capital presentation deck on the Treasurer-Tidel transaction to Tidel. In the presentation, Vector stated that it had received investor committee approval to move forward on the transaction that Plaintiffs had presented. Like the Treasurer-CSS presentation deck, the Treasurer-Tidel deck also listed the $3.5 million dollar transaction fee that was to be paid to the Plaintiffs and others.

41.    During the next two weeks Plaintiffs advised on initial drafts of a Letter of Intent ("LOI") to be signed by Vector and Laurus for the deal with Tidel. Treasurer also provided input on the draft LOI.

42.    On August 17, 2011, Vector e-mailed Treasurer and Plaintiffs and for the first time raised the possibility of closing the deal with Tidel without the Treasurer. Amish Mehta indicated that Laurus had signed the LOI granting an exclusive period to complete their due diligence. Upon information and belief the construct of the signed LOI essentially conformed to the terms arrived at by Goodrich.

43.     Throughout September, Vector represented that it was doing its due diligence on Tidel and anticipated it would be early October when Vector Capital would be in a position to reengage with Treasurer.

44.     Over the next month, Plaintiffs and Treasurer kept in periodic contact with Tidel and Vector to determine the status of the deal.  On one such call a Tidel executive told the President of Goodrich that as "the advisor on this transaction and having been an investment banker myself, you have earned every bit of your fee on this deal" alluding to the complexity of the transaction.

45.     On October 28, 2011, for the first time, Plaintiffs and Treasurer were informed that the Tidel deal was imminently closing in a matter of days, without anyone from Vector Capital reengaging Treasurer or Plaintiffs.

46.     Goodrich, having not only identified the business opportunity for Vector, but also having worked to resurrect and restructure the acquisition, demanded payment of its transaction fee at closing. Vector refused.

47.     On November 2, 2011, Vector Capital completed the acquisition of the Sentinel product line of Tidel.

48.     Vector Capital would not have identified the business opportunity of acquiring Tidel had it not executed the NDA with Goodrich and Treasurer, nor would it have closed any deal with Tidel without Goodrich's active involvement in structuring such acquisition.

49.     Armed with confidential information and business know-how, all provided by Goodrich in connection with a Contemplated Business Arrangement as defined under the NDA, Vector Capital used that information in violation of the NDA.

## AS FOR ITS FIRST COUNT

(Breach of Contract)

50.     Plaintiffs repeats and re-alleges each of its allegations set forth in Paragraphs 1 through 49 as if fully set forth herein.

51.     Defendant breached Section 2 (Scope of Use) of the Non-Disclosure Agreement by using confidential information, subject to the NDA, for a deal other than the Contemplated Business Arrangement, as defined in the NDA, all to the detriment of Plaintiffs.

52.     Defendant has breached Section 5 (Non-Circumvention) of the Non-Disclosure Agreement by excluding or minimizing Goodrich's role in the business opportunity identified by Goodrich and set forth in Vector's August presentation to Tidel.  In doing so, Vector attempted to circumvent, avoid, bypass and obviate Plaintiffs in order to avoid payment of the fees it had previously agreed to pay, including as reflected in its August presentation deck.

53.     Plaintiffs have been damaged by Defendant's breaches.

54.     Section 8 of the NDA requires that Vector pay the costs and expenses, including reasonable attorney's fees, of Plaintiffs if it is determined to have breached the NDA.

55.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but in all events not less than $3.0 million dollars, plus interest, costs, expenses and attorneys fees.

## AS FOR ITS SECOND COUNT

(Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Plaintiffs repeats and re-alleges each of its allegations set forth in Paragraphs 1 through 55 as if fully set forth herein.

57.     Defendant owed Plaintiffs a duty to act in good faith and deal fairly.

11

58.     Defendant breached this duty by, among other things, holding itself out as interested in a Treasurer deal, receiving and using confidential information regarding Treasurer and Tidel, and inducing Plaintiffs to provide valuable confidential information and business advice for a deal without the intention of honoring its obligations to Plaintiffs, including compensating Plaintiffs.

59.     Defendant's conduct was arbitrary, unreasonable, contrary to industry standards, and had the effect of preventing Plaintiffs from receiving the protection bargained for under the NDA, including the full amount of the transaction fee.

60.     Plaintiffs has been damaged by Defendant's breach of the duty of good faith and fair dealing in a number of ways, including, but not limited to, extra-contractual damages resulting from Plaintiffs' efforts in identifying potential business opportunities, providing business and financial advice to Treasurer, Vector and Tidel, and refraining from actions in reliance on Vector's actions.  Defendant's breach is the proximate cause of these damages.

61.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but in all events not less than $3.5 million dollars plus interest, costs, expenses and attorneys fees.

WHEREFORE, Plaintiffs demands judgment:

(a)     on the first cause of action, judgment against Defendant in the amount of $3.0 million dollars with interest, costs and attorneys fees;

(b)     on the second cause of action, judgment against Defendant in the amount of not less than $3.5 million dollars in actual and extra contractual damages with interest, costs and attorneys fees;

(c)     for such further and other relief that the Court deems just and proper.

Dated: December 16, 2011                     Respectfully submitted,
       New York, New York

                                             By: _____
                                                 Sarah L. Reid
                                                 Paul F. McCurdy

                                             KELLEY DRYE & WARREN LLP
                                             101 Park Avenue
                                             New York, NY 10178
                                             (212) 808-7800

                                             *Attorneys for Plaintiffs Goodrich Capital, LLC
                                             and Windsor Sheffield & Co., Inc.*