**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GOODRICH CAPITAL, LLC and WINDSOR
SHEFFIELD & CO. INC.

                               Plaintiffs,

                v.

VECTOR CAPITAL CORPORATION,

                          Defendant.

Case No.: 11-cv-9247(JSR)

ECF Case

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

EASTWOOD, SCANDARIATO & STEINBERG

Eric Steinberg
Lisa K. Eastwood

336 President Street
Saddle Brook, NJ 07663
Telephone: (973) 253-1500
Facsimile: (973) 253-1510
Eastlaw@earthlink.net

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................ii

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ..............................................................................2

ARGUMENT ..............................................................................................10

       THE FIRST AMENDED COMPLAINT ALLEGES
       PLAUSIBLE CLAIMS FOR RELIEF .........................................................10

       A.     The Rule 12(b)(6) Standard of Review ..............................................10

       B.     The First Count Properly Alleges Two Claims
             for Breach of Contract ...................................................................10

       C.     The Complaint States a Claim for Breach of the
             Duty of Good Faith and Fair Dealing ..............................................14

       D.     Plaintiffs' Pleading Meets All of the Elements
             for a Claim of Unfair Competition ..................................................16

       E.     Plaintiffs' Complaint Sufficiently Asserts a Claim for Breach
             Based on Defendant's Use of Plaintiffs' Business Idea ...........................19

       F.     Plaintiffs' Claim for Unjust Enrichment Should
             Be Sustained ...............................................................................20

       G.     Plaintiffs Have Adequately Pled a Claim for Tortious
             Interference with Contract ..............................................................22

       H.     Windsor is a Proper Party Plaintiff ..................................................24

       CONCLUSION ...................................................................................25

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*Allen v. WestPoint-Pepperell, Inc.*, 95 F.2d 40, 44 (2d Cir. 1991) ...................................10

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949
    173 L. Ed. 2d 868, 884 (2009) ...........................................................................10

*Barbagallo v. Marcum LLP*, 2011 U.S. Dist. LEXIS 123530 at *33
    (E.D.N.Y. Oct. 25, 2011) ..................................................................................25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955,
    167 L. Ed. 2d 929 (2007) ..................................................................................10

*Berman v. Sugo LLC,* 580 F. Supp. 2d 191, 202, 209 (S.D.N.Y. 2008) .....................11, 17

*Berni v. Int'l Gourmet Rest. of Amer., Inc.*, 838 F.2d 642, 648 (2d Cir. 1988) ..............25

*CBS Broad., Inc. v. Jones*, 460 F. Supp. 2d 500, 505 (S.D.N.Y. 2006) ...........................20

*Clark-Fitzpatrick, Inc. v. Long Island RR Co.*, 70 N.Y.2d 382, 388,
    516 N.E.2d 190, 521 N.Y.S.2d 653 (1987) .......................................................20

*Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 200
    (S.D.N.Y. 2006) ................................................................................................21

*Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289,
    639 N.Y.S.2d 977 (1995) ..................................................................................14

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*,
    375 F.3d 168, 177 (2d Cir. 2004) ......................................................................11

*Faively Transport USA, Inc. v. Wabtec Corp.*, 2011 U.S. Dist.
    LEXIS 52945 at *26-27 (S.D.N.Y. May 12, 2011) ........................................17, 25

*Heller v. Kurz*, 228 A.D.2d 263, 643 N.Y.S.2d 580, 581-82 (1st Dep't 1996) ..................20

*Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) ..................................................10

*Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)......................................................20

*Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) ..............................22

**Page(s)**

*Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 531 (S.D.N.Y. 2007) ....................20

*LaBarta v. Seneca Res. Corp.*, 285 A.D.2d 974, 976, 728 N.Y.S.2d
    618 (4th Dep't 2001) ..........................................................................................20

*Linkco, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 501 (S.D.N.Y. 2002) .........................17

*Milton Abeles, Inc. v. Farmers Pride, Inc.*, 603 F. Supp. 2d 500, 503, 505
    (E.D.N.Y. 2009) ...........................................................................................17, 18

*Nadel v. Play-By-Play Toys & Novelties, Inc.* 208 F.3d 368, 373-74, 380,
    376-77 (2d Cir. 2000) ....................................................................................19, 21

*Newmarkets Partners LLC v. Sal Oppenheim Jr. & CIE*,
    638 F. Supp. 2d 394, 404, 408-09 (S.D.N.Y. 2009) .................................10, 17, 20

*Prestige Caterers v. Kaufman*, 290 A.D.2d 295, 295, 736 N.Y.S.2d 335, 336
    (1st Dep't 2002) .................................................................................................20

*Roy Export Co. Estab. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105
    (2d Cir. 1982) ......................................................................................................17

*Rule v. Brine, Inc.*, 85 F.3d 1002, 1011-14 (2d Cir. 1996) ..........................................21

*Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291, 302, 299-300,
    304-05 (S.D.N.Y. 2010) .................................................................17, 19, 20, 22

*Stuart Leventhal, FZUS, Inc. v. Franzus Co., Inc.*, 1988 U. S. Dist.
    LEXIS 13651 at *20-21(S.D.N.Y. Dec. 5, 1988) ....................................................22

*Telecom Int'l Amer., Ltd. v. AT&T Corp.*, 280 F.3d 175, 198 (2d Cir. 2001) ....................17

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
    487 F.3d 89, 98 (2d Cir. 2007) ...............................................................................14

*Underdog Trucking, LLC v. Verizon Serv. Corp.*, 2010 U.S. Dist.
    LEXIS 72642 at * 10-13 (S.D.N.Y. July 20, 2010) ...................................................24

*Wagner v. JP Morgan Chase Bank*, 2011 U.S. Dist.
    LEXIS 24518 at *9-10 (S.D.N.Y. March 9, 2011) .....................................................14

*Weiss v. La Suisse*, 69 F. Supp. 2d 449, 462 (S.D.N.Y. 1999) .......................................11

**Page(s)**

## <u>RULES</u>

Fed. R. Civ. P. 8 …………………………………………………………………………………..11

Fed. R. Civ. P. 12(b)(6) …………………………………………………………………..10, 13, 25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GOODRICH CAPITAL, LLC and WINDSOR
SHEFFIELD & CO. INC.

                      Plaintiffs,

          v.

VECTOR CAPITAL CORPORATION,

                  Defendant.

Case No.: 11-cv-9247(JSR)

ECF Case

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Plaintiffs Goodrich Capital, LLC ("Goodrich Capital") and its affiliate, Windsor Sheffield & Co., Inc. ("Windsor") (collectively, "Plaintiffs" or "Goodrich") submit this memorandum of law in opposition to the motion of defendant Vector Capital Corporation ("Vector" or "Defendant") to dismiss the First Amended Complaint ("Complaint") pursuant to Rule 12 (b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This is an action for breach of contract, unfair competition, and unjust enrichment. Defendant has in bad faith and deceitfully misappropriated the product of the labors, skills and expenditures of Plaintiffs, and has used and has been unjustly enriched to Plaintiffs' detriment by such use of confidential information and material provided to Defendant by Plaintiffs.

Plaintiffs spent some 22 months developing business plans, marketing strategies, market analyses, business valuations, and critical business strategies relating to the use of smart safes in the cash management industry. Defendant, a $2 billion private equity company, expressed significant interest in financing the business opportunity proposed by Plaintiffs and entered into a written Non-Disclosure and Confidentiality Agreement with Plaintiffs ("NDA"). The NDA was

not limited to a particular transaction, but rather covered any project involving the cash management industry. Plaintiffs disclosed their work product to Defendant pursuant to the NDA. Thereafter, utilizing the proprietary business strategies and work product developed by Plaintiffs, Defendant jettisoned Plaintiffs from the transaction in violation of the NDA and closed on 95% of the business opportunity proposed by Plaintiffs without paying Plaintiffs any compensation.

Defendant contends it has no obligation to pay Plaintiffs for its use of Plaintiffs' labor, skills and expenditures because the business opportunity it closed on was not the complete transaction proposed by Plaintiffs. As set forth fully below, Defendant's contention is unsupported by the clear language and intent of the parties as expressed in the NDA and is without merit under the law. Accordingly, Defendant's motion should be denied in its entirety.[1]

## STATEMENT OF FACTS

Goodrich Capital is in the business of advising companies in identifying, developing and implementing strategic business transactions. (Complaint 7). Goodrich Capital is affiliated with Windsor, a registered securities broker/dealer that provides comprehensive high investment management, capital-raising, and management advisory services. (Complaint ¶ 9).

In late 2009, Richard Irvin ("Irvin") retained Goodrich Capital and subsequently Windsor as an advisor and to raise cash for a transaction involving a new and innovative cash management business, The Treasurer ("Treasurer"), which is targeted to retailers that use safes to hold daily cash receipts. (Complaint ¶¶ 10-11). Goodrich Capital and Windsor used their skills, experience, labor and expenditures to formulate a business model for Treasurer, including

---

[1] To the extent the Court considers dismissal of any count in the Complaint because of a pleading deficiency, Plaintiffs respectfully request an opportunity to amend the Complaint to cure the purported defect. The case is in its early stages with no documents having been exchanged, and there will be no prejudice to Defendant. Moreover, the Case Management Plan in this case allows for amended pleadings to be filed without leave of Court until April 3, 2012.

naming the entity, and formulated the strategy to purchase an established smart safe company to serve as a platform company, enabling Treasurer to control the total customer experience for cash transactions and allow for future build outs of enhanced software features. The purchase of the smart safe company was the largest financial component of the transaction formulated by Plaintiffs, representing in excess of 90% of the transaction value. (Complaint ¶ 13).

In the fall of 2010, Irvin and Plaintiffs identified and secured the interest of Corporate Safe Specialists ("CSS"), a smart safe developer, to be the platform company for Treasurer. Plaintiffs and Treasurer arrived at a term sheet and a transaction value of $60 million. (Complaint ¶ 14). Windsor contacted Vector, a $2 billion private equity firm, to determine its interest in pursuing an opportunity in a cash management system. (Complaint ¶¶ 15-16). Vector indicated it was interested, and on November 11, 2010, Vector entered into the NDA with Goodrich Capital, together with its affiliates, and Treasurer. Vector had no prior knowledge of the cash management industry, the parties that make up the supply chain in the industry, and any of the gating factors for the retail sector of the industry. (Complaint ¶¶ 17-18).

The NDA prohibits Vector from using any confidential information disclosed to it by Plaintiffs for any transaction other than the contemplated business opportunity between Vector, Plaintiffs and Treasurer. (Complaint ¶ 20; NDA§ 2). The purpose of the NDA is to facilitate the free flow of protected information between the parties and to protect the work product of Plaintiffs and Treasurer. (Complaint ¶ 21). Plaintiffs spent substantial time and resources helping to craft a business strategy for a Treasurer-CSS deal, including adding the platform component and analyzing its potential for growth and market competition. Plaintiffs prepared a presentation deck for potential investors, including Vector, of its qualitative and quantitative analyses of the business structure, which contained non-public, confidential

information, including but not limited to: the investment opportunity in the relevant industries, the bases of the integrated business strategy, strategic growth opportunities, competitor information, potential customer information, target companies, and proprietary information concerning existing cash management systems and safe companies, as well as combinations thereof. In accordance with the terms of the NDA, information about business strategies, market analyses, valuations and the like disclosed orally to Vector by Plaintiffs, as well as the Treasurer-CSS presentation deck, were confidential. (Complaint ¶¶ 21-22).

At Vector's request, the presentation deck and a financial model prepared by Plaintiffs were sent to Vector.  Vector had no prior knowledge of the confidential information contained in the presentation deck as well as no understanding of the retail cash management industry, the use of smart safes in that market, the potential for growth in the market by use of integrated solutions to industry barriers, or the makeup of the customers and the companies servicing them within the industry.  Vector, after receiving the confidential material from Plaintiffs, never acknowledged having any prior knowledge or familiarity with the contents. (Complaint ¶ 23).

The presentation deck outlined the landscape of the current marketplace in the relevant industry, how current cash management was handled with traditional safes and smart safes, how Treasurer would alter retail cash management, and provided a revenue model and business strategy, including the role of intellectual property and customer care. (Complaint ¶ 24).  The presentation deck also outlined the sources and uses of the funds procured to finance a safe company acquisition to constitute the centerpiece of a broader financial services platform. Among the line items listed in the presentation deck is "Transaction Fees (Goodrich and other)" in the amount of $3.5 million dollars.  (Complaint ¶ 25).

Pursuant to the NDA, Plaintiffs, among other things, introduced Vector to the cash

management industry, provided Vector with details of the strengths and weaknesses of the cash
management market, provided Vector with integrated solutions to traditional barriers in the cash
management industry, provided Vector with business models for the cash management industry,
provided Vector with competitive market assessments for the cash management industry,
identified for Vector target companies, including CSS and Tidel Engineering, LP ("Tidel"), to
use as the centerpiece platform for integrated solutions to current barriers and obstacles in the
cash management industry, and provided Vector with financial models and valuations for use in
acquisitions. (Complaint ¶¶ 26, 32).

Vector told Plaintiffs that Vector would not be interested in a smart safe company as a
stand alone without the involvement of Treasurer and the business model presented by Plaintiffs
and Treasurer. (Complaint ¶ 28).  Thus, Defendant led Plaintiffs to believe that it was exclusively
interested in the Contemplated Business Arrangement identified in the NDA. (Complaint ¶ 63).
Shortly thereafter, Vector requested that Plaintiffs provide Vector with additional material and
information about CSS, which information Plaintiffs obtained for Vector. (Complaint ¶ 29).

On February 9, 2011, Vector e-mailed both Plaintiffs the terms of Vector's proposal for
the acquisition of CSS, acknowledging that Vector became interested in the transaction as a
result of work performed by both Plaintiffs.  Among the terms, Vector stated "we will pay the
Goodrich fee and shoulder the transaction expenses." (Complaint 30).  Earlier that month,
without any involvement by Plaintiffs, CSS received a competing offer from Pfingsten Partners,
LLC which CSS ultimately accepted.  Upon hearing of the acquisition of CSS, Plaintiffs, with
Vector's agreement and encouragement, undertook to find a replacement platform company.
Within a couple of days, Plaintiffs contacted Tidel, which had previously been identified by
Plaintiffs as a potential platform company. (Complaint ¶¶ 31-32).

The confidential presentation deck previously disclosed by Plaintiffs to Vector had identified Tidel as a manufacturer/developer of smart safes and a potential target platform company for the parties' Contemplated Business Arrangement.  Plaintiffs contacted Tidel to ascertain whether Tidel had interest in being considered as the platform company for the Treasurer deal as a replacement for CSS. (Complaint ¶ 33).  The principals of Treasurer and Goodrich Capital met at Tidel's offices in Dallas, Texas to discuss the potential acquisition of Tidel.  Tidel executives indicated that they were very interested.  At that time, Tidel had two product lines - the Sentinel line of smart safes used by small and midsize retailers, and the Revolution line used by larger retailers for cash management. (Complaint ¶ 34).  The following week, Vector surreptitiously and independently visited the Tidel management team in Dallas without fully disclosing to Plaintiffs its intended purpose for the visit, all in an effort to conceal its actions and plans from Plaintiffs. (Complaint ¶ 35).

On March 11, 2011, Goodrich, Tidel and the Treasurer entered into a Confidentiality and Non-Disclosure Agreement substantially similar to the NDA with Vector, but which also included a broader provision prohibiting Tidel from circumventing, avoiding, bypassing or obviating the other parties to the agreement, directly or indirectly, "to avoid payment of fees or other compensation or to exclude the other party or minimize its role in *any transaction or business opportunity identified by the parties.*" (Complaint ¶ 36)(emphasis added).

Thereafter, Vector surreptitiously and without including Plaintiffs began preparing an offer to acquire all of Tidel's assets.  Contrary to its agreement, Vector never once involved or notified Plaintiffs or Treasurer of its attempt to acquire Tidel.  Vector, directly or indirectly, attempted to circumvent, avoid and bypass Plaintiffs in its effort to purchase Tidel. (Complaint ¶ 37).  In or about early April, 2011, Tidel's chief executive in a surprise announcement to

Plaintiffs and Treasurer advised Plaintiffs that the chief executive of Laurus Capital

Management, LLC ("Laurus"), the owner of Tidel, had rejected a Vector offer earlier that week

for the acquisition of all of Tidel's assets. The Tidel chief executive further stated that he would

not divulge the details of the offer, but did say that Vector had been in Tidel's offices for most of

March preparing the offer and doing due diligence. Prior to early April 2011, Plaintiffs had no

knowledge of Vector's offer or Vector's due diligence of Tidel. Vector never disclosed to

Plaintiffs that it had made such an offer, or that it had been rejected. (Complaint ¶¶ 38-39).

During the March through July 2011 period, Plaintiffs spent a substantial amount of time

and resources attempting to construct a transaction with Tidel by creating a structure which

would be viable and attractive to Vector, Tidel management, Laurus (Tidel's owner), Treasurer

and Plaintiffs. Plaintiffs ultimately proposed a new deal structure where only the Sentinel

product line of Tidel would be the centerpiece platform to support Treasurer and would be

included in the overall transaction. (Complaint ¶ 40). In July 2011, after significant effort and

work, Plaintiffs had in place all of the elements for a Treasurer-Tidel deal. Plaintiffs contacted

Vector and informed them that they believed a deal with Tidel for purchasing the Sentinel line

only as the centerpiece platform for Treasurer was feasible and wanted to set up a meeting

between Plaintiffs and Vector in order to present the deal structure and financing it had

developed for a transaction involving Tidel. (Complaint ¶ 42).

Vector expressed strong and immediate interest in pursuing the deal based on buying

Tidel's Sentinel product line as support for Treasurer. On August 3, 2011, Goodrich circulated

to Tidel a presentation deck on the Treasurer-Tidel transaction prepared by Vector, where Vector

indicated that it was "thrilled" to finally have the opportunity to merge Tidel and Treasurer.

Vector stated that it had received investor committee approval to move forward with the $70.5

million dollar transaction that Plaintiffs had presented. The Treasurer deck prepared by Vector also listed and reaffirmed the $3.5 million dollar transaction fee that was to be paid to the Plaintiffs and others. (Complaint ¶¶ 43-44). During the next two weeks Plaintiffs, who Vector considered and repeatedly referred to in writing as members of the "Team," advised on initial drafts of a Letter of Intent ("LOI") to be signed by Vector and Laurus for the deal with Tidel. (Complaint ¶ 45)

On August 17, 2011, 14 days after Vector circulated its presentation affirming that it was "thrilled" to proceed with the Tidel-Treasurer transaction, and after Plaintiffs spent 22 months putting together a deal, Vector announced for the first time the possibility that it would be closing on a deal with Tidel without Treasurer. Thereafter, throughout September, Vector advised Plaintiffs that it was engaged in due diligence of Tidel and anticipated it would be early October when Vector would be ready to re-initiate an arrangement with Treasurer-Tidel. Vector's due diligence of Tidel would have disclosed the March 11, 2011 NDA entered into between Plaintiffs, Tidel and Treasurer in which Tidel agreed that it would not unfairly seek "to circumvent, avoid, bypass or obviate [Plaintiffs], either directly or indirectly, to avoid payment of [Plaintiffs'] fees or other compensation or to exclude [Plaintiffs] or minimize its role, in any transaction or business opportunity identified by [Plaintiffs]." (Complaint ¶¶ 46-47).

Over the next month, Plaintiffs and Treasurer continued to communicate with Tidel and Vector to determine the status of the transaction. Tidel CFO Jeff Galgano told Plaintiffs that as "the advisor on this transaction and having been an investment banker myself, you have earned every bit of your fee on this deal" alluding to the complexity of the transaction. (Complaint ¶ 48). On October 28, 2011, Plaintiffs and Treasurer were informed that a Vector-Tidel deal was closing in a matter of days, without anyone from Vector discussing the matter with Plaintiffs or

Treasurer. (Complaint ¶ 49). Plaintiffs, having not only identified and developed the business opportunity involving Tidel, having provided Vector with substantial material relating to the transaction, much of which was confidential, and also having worked to resurrect and innovatively restructure the acquisition which Vector had been unable to do independently, requested payment of its fee. Vector refused. (Complaint ¶ 50).

On November 2, 2011, Vector completed the acquisition of the Sentinel product line of Tidel without paying Plaintiffs' fee. On November 3, 2011, Tidel announced that it was acquired by Vector and Tidel management with plans to accelerate Tidel's growth within the electronic safe market and to use Tidel as the platform in the cash management industry.[2] One of Vector's partners and one of its officers joined Tidel's Board of Directors after the acquisition. (Complaint ¶¶ 51-52).

Vector would not have identified the business opportunity of acquiring Tidel had it not executed the NDA with Plaintiffs and Treasurer and had it not used the material, confidential and otherwise, provided by Plaintiffs, nor would it have closed any deal with Tidel without Plaintiffs' active involvement, substantial efforts, and work product in structuring the acquisition. Armed with confidential information and business know-how, all provided by Plaintiffs in connection with the Contemplated Business Arrangement, as defined in the NDA, and reflecting the significant involvement and work of Plaintiffs in developing the transaction, Vector used that information in violation of the NDA and in bad faith and unfairly misappropriated the product of Plaintiffs' labors, skills and expenditures to unjustly enrich itself all to Plaintiffs' financial detriment. (Complaint ¶¶ 53-54).

---

[2]     At this stage of the action, Plaintiffs have received no substantive discovery from Defendant, nor from non-party Tidel pursuant to subpoena. Plaintiffs are confident that such discovery will lead to additional evidence to support their claims and may reveal further breaches and wrongful conduct by Defendant.

## ARGUMENT

### THE FIRST AMENDED COMPLAINT ALLEGES
### PLAUSIBLE CLAIMS FOR RELIEF

**A.      The Rule 12(b)(6) Standard of Review**

In considering a Rule 12(b)(6) motion to dismiss, the court should construe the complaint liberally, accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor. *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive the motion, plaintiff must plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The plausibility standard is less than a probability requirement, and requires only that plaintiff show something more than sheer speculation or a mere possibility that defendant acted unlawfully. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868, 884 (2009). Plaintiff need not plead detailed factual allegations, but must allege more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Bell Atl.*, 550 U.S. at 555. The court's consideration on the motion is restricted to the facts alleged on the face of the complaint, in documents appended to the complaint or incorporated by reference, in documents relied on in bringing suit, and to matters of which judicial notice may be taken. *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991); *Newmarkets Partners LLC v. Sal Oppenheim Jr. & CIE*, 638 F. Supp. 2d 394, 404 (S.D.N.Y. 2009).

As fully set forth below, Plaintiffs' Complaint alleges ample factual content that would allow the Court to draw reasonable inferences, well beyond the speculative level, that the Defendant is liable for the misconduct alleged. Accordingly, Plaintiffs' Complaint meets the standard of having stated plausible claims for relief against Defendant.

**B.      The First Count Properly Alleges Two Claims for Breach of Contract**

10

A claim for breach of contract under New York law requires that the plaintiff demonstrate (1) the existence of an agreement, (2) adequate performance by plaintiff, (3) breach by defendant, and (4) damages. *Eternity Global Master Fund Ltd. V. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004). Under Fed. R. Civ. P. 8, a plaintiff alleging a breach of contract claim is required only to provide defendant with a "short, plain notice" of the claims against it, and there is no need to plead with particularity. *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008); *Weiss v. La Suisse*, 69 F. Supp. 2d 449, 462 (S.D.N.Y. 1999).

In their first claim for relief, Plaintiffs allege that they entered into the NDA with Defendant to explore a business transaction among Plaintiffs, Defendant and Treasurer. (Complaint ¶ 17, NDA Preamble). The NDA defines the explored transaction among the parties as the "Contemplated Business Arrangement." (Complaint 19, NDA Preamble). The Complaint further alleges that in accordance with the terms of the NDA, Plaintiffs both orally and in writing disclosed to Defendant confidential business plans, strategies, ideas, marketing information, competitive market assessments, industry target companies, valuations, growth projections, and additional information about the industry necessary to evaluate the Contemplated Business Arrangement. (Complaint ¶¶ 21-26, 53-54, 56). The Complaint goes on to assert that Defendant thereafter used that confidential information for a business opportunity (its purchase of Tidel) other than the Contemplated Business Arrangement in violation of section 2 of the NDA defining the scope of use of such confidential information. (Complaint ¶¶ 20, 53-54, 56, NDA § 2). These allegations are more than sufficient to plausibly state a claim for breach of the NDA.

In addition, the first count alleges that Defendant also breached section 5 of the NDA by excluding or minimizing Plaintiffs role in the transaction that Defendant concluded. (Complaint ¶¶ 20, 37, 57). The Complaint alleges that Plaintiffs identified the business opportunity that

11

Defendant ultimately closed on, which consisted of about 95% of the cost of the NDA's

Contemplated Business Arrangement, and yet excluded Plaintiffs from the transaction in order to

avoid paying Plaintiffs any compensation. (Complaint ¶¶ 53-54, 57).  These allegations likewise

state an independent basis for breach of contract.

Defendant argues that Plaintiffs cannot maintain a claim for breach because Defendant

didn't close on the exact Contemplated Business Arrangement that the parties initially were

exploring.  Defendant's argument is belied by both the language of the NDA and the intent of the

parties in entering into the NDA and defies logic.

Section 2 of the NDA provides in pertinent part:

> Recipient [Vector] shall not use any portion of the Confidential
> Information of Discloser [Plaintiffs] except to the extent reasonably
> necessary to explore the Contemplated Business Arrangement.
> Recipient [Vector] shall make no other use of the Confidential Information
> or any portion thereof or any of the related materials and documents
> furnished by Discloser [Plaintiffs] at any time.

Thus, the NDA prohibits Defendant from using any confidential information disclosed by

Plaintiffs for any transaction other than one among Plaintiffs, Treasurer and Defendant.  The

Complaint alleges that Defendant used such information for its own self-interest in connection

with a transaction other than the Contemplated Business Arrangement (Defendant's purchase of

Tidel without Treasurer) and thus breached the NDA. (Complaint ¶¶ 53-54, 56).  If, as Defendant

suggests, it was free to use confidential information with impunity for any other transaction,

there would have been no need at all for the NDA, rendering the agreement superfluous.

Defendant erroneously argues that the Complaint does not allege that Defendant used

any of Plaintiffs' confidential information in connection with its purchase of Tidel.  Defendant's

contention is fallacious as a simple review of paragraphs 21-26, 50, 53-54, and 56 of the

Complaint establish beyond cavil that Plaintiffs allege Defendant improperly used confidential information in violation of the NDA.

Defendant next contends, in conclusory fashion and without any factual basis in the Complaint, that any confidential information disclosed to it had to be the Treasurer's and not Plaintiffs' because the Treasurer is alleged in the Complaint to be a proprietary system.  There is no basis in fact or law for Defendant's contention that Plaintiffs did not provide any confidential information to Defendant.  The Complaint alleges that Plaintiffs prepared and shared with Defendant confidential business plans, business strategies, market assessments, valuations, and growth projections, among other information.  (Complaint ¶¶ 21-26, 50, 53)  Accepting Plaintiffs' allegations as true, as the Court must on a Rule 12(b)(6) motion, there is no ground to discount Plaintiffs' factual allegations that they prepared and disclosed confidential information that Defendant improperly used for a transaction other than the Contemplated Business Arrangement among Plaintiffs, Treasurer and Defendant.

Defendant likewise argues that because it never closed on the transaction among Plaintiffs, Treasurer and Defendant, it cannot breach § 5 of the NDA governing exclusion of the parties from a transaction.  Section 5 of the NDA provides in pertinent part:

> Neither party shall seek, in violation of any agreement between the parties entered into after the date hereof with respect to the Contemplated Business Arrangement, to circumvent, avoid, bypass or obviate the other party, either directly or indirectly, to avoid payment of fees or other compensation or to exclude the other party or minimize its role, in any transaction or business opportunity identified by the parties, and as described in any such agreement.

The Complaint alleges that Defendant excluded Plaintiffs from its purchase of Tidel, which was a business opportunity identified by Plaintiffs, in order to avoid paying Plaintiffs any compensation. (Complaint ¶¶ 32-33, 35, 37, 57).  The Complaint further alleges that Defendant agreed to pay Plaintiffs' fees on several occasions, including in Defendant's August 2011

presentation to purchase Tidel which was circulated to Tidel and Plaintiffs.  (Complaint ¶ 44).

The purchase of Tidel consisted of approximately 95% of the proposal made by Plaintiffs to

develop a Tidel-Treasurer entity.  (Complaint ¶ 13).  Plaintiffs contend that Defendants' August

2011 proposal coupled with the NDA prohibited Defendant from excluding Plaintiffs from the

business opportunity Plaintiffs' identified.  Accordingly, Plaintiffs' Complaint alleges sufficient

facts to state a separate, second plausible claim for breach of contract such that the motion to

dismiss should be denied.

### C.    The Complaint States a Claim for Breach of the Duty of Good Faith and Fair Dealing

Under New York law, a covenant of good faith and fair dealing is implicit in all contracts

during the course of performance.  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487

F.3d 89, 98 (2d Cir. 2007)(*citing Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 639

N.Y.S.2d 977, 663 N.E.2d 289 (1995)).  The covenant "embraces a pledge that neither party

shall do anything that will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract."  *Dalton*, 87 N.Y.2d at 389, 639 N.Y.S.2d at 979, 663 N.E.2d at

291.  The covenant is violated when a party who has promised another the opportunity to earn

fees, commissions or profit does not act in good faith to permit such compensation to be earned.

*Wagner v. JP Morgan Chas Banke*, 2011 U.S. Dist. LEXIS 24518, at *9-10 (S.D.N.Y. March 9,

2011).  In determining whether a party has breached the covenant of good faith and fair dealing,

a court must examine the express language of the parties' agreement, as well as any course of

performance and course of dealing that may exist between them.  *Tractebel*, 487 F.3d at 98-99.

Thus, whether particular conduct violates the duty of good faith and fair dealing is typically a

fact question for the jury.  *Id.*

14

Plaintiffs' Complaint alleges that Vector over the course of more than eights (8) months continuously and repeatedly advised Plaintiffs that it was pursuing a transaction that included Vector, Treasurer and a smart safe company to act as a platform for further developments in the cash management industry, using the Treasurer business model developed by Plaintiffs and Treasurer. (Complaint ¶¶ 17, 28-29, 32, 43-45, 47). To that end, Vector, Plaintiffs and Treasurer signed the NDA which was to protect the free flow of confidential information and material among the parties. (Complaint ¶21). The Complaint further alleges that at the same time Defendant was assuring Plaintiffs that it was pursuing a business arrangement with the Treasurer, which would have generated significant fees for Plaintiffs, Defendant was surreptitiously pursuing a transaction that excluded Plaintiffs and Treasurer in an effort to avoid paying Plaintiffs their fees. (Complaint ¶¶ 35, 37-39, 49-50, 63).

The Complaint goes on to allege that after Defendant's first attempt, without negotiating with and including Plaintiffs or Treasurer, to purchase Tidel failed, Plaintiffs developed a business strategy with different terms than previously proposed by Defendant that resurrected a transaction among Plaintiffs, Defendant and Treasurer with Tidel. (Complaint ¶¶ 40, 42, 50). Plaintiffs' pleading further asserts that Defendant again encouraged Plaintiffs to continue to pursue the transaction among Plaintiffs, Defendant and Treasurer with Tidel, and Plaintiffs obliged. (Complaint ¶¶ 43-45). Yet after spending more time, effort and expenditures on a transaction among Plaintiffs, Defendant and Treasurer with Tidel, Defendant once again excluded Plaintiffs from the transaction, did not negotiate with Plaintiffs or Treasurer, and concluded a transaction with Tidel that Plaintiffs had identified without compensating Plaintiffs. (Complaint 46-54).

If proven at trial, these allegations would establish that Defendant had a duty under the NDA to deal fairly with Plaintiffs so as to not circumvent Plaintiffs role in the transaction identified by Plaintiffs, that Defendant breached that duty by leading Plaintiffs to believe they would not be excluded, asking for and receiving services from Plaintiffs in connection with the transaction identified by Plaintiffs, and at the same time, secretly engaging in the Tidel transaction without including and negotiating with Plaintiffs and Treasurer.  Defendant's conduct resulted in Plaintiffs' loss of fees as a result of a lost business opportunity. (Complaint ¶¶ 64-65).

Defendant formalistically argues that because Plaintiffs have asserted a breach of contract claim, they cannot pursue a claim for breach of the implied covenant of good faith and fair dealing.  Defendant's simplistic argument is unsupported under the law.  Defendant separately breached the duty of good faith and fair dealing by leading Plaintiffs to believe during the course of performance that Plaintiffs would participate in the transaction with Tidel, asking Plaintiffs to assist Defendant, while at the same time using Plaintiffs' confidential information to surreptitiously pursue the transaction without Plaintiffs.

Moreover, Defendant's own argument raised in response to Plaintiffs breach of contract count contradicts its argument here. Defendant argues that there was no contract for a transaction that included Tidel.  If that were the case, then Plaintiffs' claim that Defendant breached the duty of good faith and fair dealing by acting in a manner designed to prevent Plaintiffs from receiving the fruits of the NDA, which Plaintiffs had performed under, states a plausible separate breach of the implied contractual covenants.  Thus, Defendant's motion seeking dismissal of the second count should likewise be denied.

### D.   Plaintiffs' Pleading Meets All of the Elements for a Claim of Unfair Competition

Defendant completely misstates the law of unfair competition and erroneously argues that a required element of such a claim under New York law is a showing of confusion or deception of the origin of goods. The Second Circuit soundly rejected this argument in *Telecom Int'l America, Ltd. v. AT&T Corp.*, 280 F.3d 175, 198 (2d Cir. 2001). The tort of unfair competition under New York law is founded on the principle that one may not misappropriate the product of the labor, skills and expenditures of another – that is, the misappropriation of a party's work product. *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291, 302 (S.D.N.Y. 2010), *aff'd;* 438 Fed. Appx. 45 (2d Cir. 2011); *see also Faively Transport USA, Inc. v. Wabtec Corp.*, 2011 U.S. Dist. LEXIS 52945 at *26-27 (S.D.N.Y. May 13, 2011)(a claim for unfair competition lies where one party has misappropriated the labors and expenditures of another and displayed some element of bad faith in doing so). The essence of the claim is that the "defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship. *Telecom Int'l*, 280 F.3d at 197.

The tort is a broad and flexible doctrine that depends more upon the facts set forth than in most other claims for relief. *Roy Export Co. Estab. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982); *Newmarkets Partners LLC v. Sal Oppenheim Jr. & CIE,* 638 F. Supp. 2d 394, 408-09 (S.D.N.Y. 2009); *Milton Abeles, Inc. v. Farmers Pride, Inc.*, 603 F. Supp. 2d 500, 503 (E.D.N.Y. 2009). A claim of unfair competition may be based upon misappropriation of one party's internal documents, business strategies, client lists and business materials, among other items. *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 209 (S.D.N.Y. 2008); *Sokol*, 726 F. Supp. 2d at 302; *Milton Abeles*, 603 F. Supp. 2d at 503; *see also*, *Linkco, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 501 (S.D.N.Y. 2002)("the doctrine of unfair competition has been applied in

17

various situations, like this, where the plaintiff alleges misappropriation of information that does not rise to the level of misappropriation of trade secrets or ideas."). The proper measure of damages for the misappropriation and use of confidential information is the loss of profits sustained by virtue of the misconduct. *Milton Abeles,* 603 F. Supp. 2d at 505.

Here, it is apparent that Plaintiffs' pleading more than adequately meets all of the elements necessary to state a plausible claim for unfair competition under New York law. The Complaint alleges that: (1) Plaintiffs spent substantial time effort and money in developing a business strategy and related documents and information (Complaint ¶¶ 21-26, 40-42, 54); (2) Defendant signed a confidentiality agreement promising not to use the information for some other purpose other than that stated in the agreement (Complaint ¶ 17, NDA § 2); (3) much of Plaintiffs' disclosures to Defendant were innovative and novel (Complaint ¶¶ 21, 23-26, 56, 69, 75); (4) under the NDA title to the disclosed information remained with the Plaintiffs (Complaint ¶ 68, NDA § 4); and (5) Defendant, in violation of its confidentiality obligations and in a deceptive fashion after stringing Plaintiffs along, misappropriated the fruits of Plaintiffs' skill, labors and expenditures for its own commercial advantage. (Complaint ¶¶ 53-54, 70-72). The Complaint then asserts that Plaintiffs were damaged by the loss of their time, work, and expenditures, i.e., their lost profit/fees. (Complaint ¶¶ 54, 72-73).

Defendant argues that Plaintiffs have failed to allege conduct that would show Defendant's bad faith in misappropriating Plaintiffs' work product. Defendant's contention is utterly without any merit. Plaintiffs' Complaint alleges the requisite bad faith by asserting that Defendant's actions were in violation of the parties' confidentiality agreement. Moreover, Defendant's bad faith is also demonstrated by Plaintiffs' allegations that Defendant accepted disclosure of Plaintiffs' work product and requested additional services from Plaintiffs, while

surreptitiously and deceptively investigating a transaction with Tidel that would exclude Plaintiffs and Treasurer without disclosing that fact to Plaintiffs in order to circumvent Plaintiffs' involvement in the transaction.  Under the circumstances, Plaintiffs have adequately pled the claim and Defendant's motion should be denied with respect to the third count of the Complaint.

### E.   Plaintiffs' Complaint Sufficiently Asserts a Claim for Breach Based on Defendant's Use of Plaintiffs' Business Idea

The Second Circuit and this Court have held:

> New York law protects ideas that have been disclosed pursuant to a confidentiality agreement. If a party uses an idea in violation of a confidentiality agreement, it is liable under New York's "submission-of-idea" doctrine.

*Sokol,* 726 F. Supp. 2d at 299-300; *see also Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 373-74 (2d Cir. 2000).  In order to prevail on the claim, the plaintiff must show that the submission was valuable to defendant.  *Sokol*, 726 F. Supp. 2d at 300.  Where the idea was submitted pursuant to a non-disclosure agreement, the plaintiff can establish that the defendant received valuable consideration by showing that the disclosed idea was novel to the defendant. *Nadel*, 208 F.3d at 380.

Here, Plaintiffs allege that they submitted information, analyses, projections, valuations, business plans and business strategies to Defendant pursuant to the NDA. (Complaint 21-26). Under the NDA, title to the submitted material remained with Plaintiffs. (Complaint ¶¶ 68, NDA § 4).  The Complaint further alleges that the material submitted by Plaintiffs contained ideas that were novel and innovative to Defendant (Complaint ¶¶ 69, 75), and Defendant breached the parties' agreement by using the material without compensating Plaintiffs. (Complaint ¶ 76). Under *Nadel* and *Sokol,* these allegations state a plausible claim for relief, and Defendant's motion to dismiss the fourth count in the Complaint should be denied.

### F.  Plaintiffs' Claim for Unjust Enrichment Should be Sustained

To establish a claim for unjust enrichment under New York law, plaintiff must demonstrate that (1) defendant was enriched, (2) the enrichment was at plaintiff's expense, and (3) the circumstances are such that equity and good conscience require the defendant to make restitution. *Sokol*, 726 F. Supp. 2d at 303-04; *CBS Broad., Inc. v. Jones,* 460 F. Supp. 2d 500, 505 (S.D.N.Y. 2006).  The gravamen of the claim is that one party has parted with something of value that has been received by another at the first party's expense.  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).  In exercising the discretion inherent in assessing the "equity and good conscience" element of an unjust enrichment claim, New York courts have often looked to whether the plaintiff performed services for the defendant, *Heller v. Kurz*, 228 A.D.2d 263, 643 N.Y.S.2d 580, 581-82 (1st Dept 1996), whether the plaintiff performed services at the defendant's behest, *Prestige Caterers v. Kaufman,* 290 A.D.2d 295, 295, 736 N.Y.S.2d 335, 336 (1st Dep't 2002), and whether the defendant assumed an obligation to pay the plaintiff for services the defendant received. *LaBarte v. Seneca Res. Corp*., 285 A.D.2d 974, 976, 728 N.Y.S.2d 618 (4th Dep't 2001).

New York law further provides that the "existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island RR Co*., 70 N.Y.2d 382, 388, 516 N.E.2d 190, 521 N.Y.S.2d 653 (1987).  However, "when there is a bona fide dispute as to the existence of a contract, a party may proceed upon a theory of unjust enrichment, and an unjust enrichment claim may be alleged alongside a breach of contract claim." *Newmarkets Partners LLC v. Sal Oppenheim Jr. & CIE,* 638 F. Supp. 2d 394, 409-10 (S.D.N.Y. 2009) (*quoting Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 531 (S.D.N.Y.

2007)); *see also Nadel,* 208 F.3d at 376-77(action claiming misappropriation of property and, alternatively, breach of express or implied-in-fact contract may be brought against one who allegedly uses ideas of another without payment); *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011, 1014 (2d Cir. 1996)(where a party fails to prove a valid, enforceable contract, the court may allow recovery in unjust enrichment for events arising out of the same subject matter); *Command Cinema Corp. v. VCA Labs, Inc.,* 464 F. Supp. 2d 191, 200 (S.D.N.Y. 2006)(same).

Here, Plaintiffs have alleged sufficient facts to state a claim for unjust enrichment. Plaintiffs allege that they provided substantial time, effort and expenditures to bring about the transaction concluded by Defendant.  Plaintiffs further allege that they provided confidential information to Defendant which Defendant used for its own benefit in violation of the parties' agreement.  Moreover, the Complaint asserts that Defendant asked Plaintiffs to obtain information for Defendant which request Plaintiffs complied with, and, indeed, as a consequence of Plaintiffs' efforts, Defendant specified on several occasions that it would pay Plaintiffs' fees. In light of Defendant's improper use of Plaintiffs' confidential information, and Defendant's deceptive conduct in stringing Plaintiffs along with the promise of participation in Defendant's transaction, equity and good conscience require that Defendant compensate Plaintiffs.

Defendant disputes that Plaintiffs would be entitled to relief on a claim for unjust enrichment because it has a breach of contract claim.  Defendant's argument is unsupported under the law.  Furthermore, it is totally inconsistent since Defendant contends on the one hand that the contract relied on by Plaintiffs does not cover the subject matter of the transaction in issue, and then, on the other hand, it argues that Plaintiffs cannot pursue an unjust enrichment claim because they have a contract governing the same subject matter.  Defendant cannot have it both ways.  While Plaintiffs may recover under a contract theory or an unjust enrichment theory

– but not both – there is clearly a bona fide dispute as to whether Defendant breached the NDA and, therefore, Plaintiffs are not precluded from pleading unjust enrichment in the alternative. Accordingly, Vector's motion to dismiss the unjust enrichment claim should also be denied.

### G.   Plaintiffs Have Adequately Pled a Claim for Tortious Interference with Contract

"Under New York law, the elements of a claim for tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006); *Sokol*, 726 F. Supp. 2d at 304-05. A plaintiff need not show malice to prove a claim of tortious interference with an existing contract. *Id.; Stuart Leventhal, FZUS, Inc. v. Franzus Co., Inc.* 1988 U.S. Dist. LEXIS 13651 at *20-21 (S.D.N.Y. Dec. 5, 1988). Plaintiff need only show that the tortfeasor performed a purposeful act which was intended to induce the breach which the plaintiff complains of. *Id.*

Plaintiffs' Complaint alleges that Plaintiffs entered into an agreement with Tidel whereby Tidel agreed, even more broadly than Vector, that **Tidel would not "exclude [Plaintiffs] or minimize [Plaintiffs'] role in any transaction or business opportunity identified by the parties.**" (Complaint ¶¶ 36, 47)(emphasis added). The Complaint further alleges that Plaintiffs identified the business opportunity that was ultimately transacted between Tidel and Vector, and that Vector through its due diligence knew that Tidel had entered into the contract with Plaintiffs. (Complaint ¶ 47). The Complaint also asserts that in the fall of 2011, Tidel's CFO continued to advise Plaintiffs that Plaintiffs had earned their fee, (Complaint ¶ 48), while Vector, which was financing the transaction, advised Plaintiffs shortly thereafter that Plaintiffs would not be paid their fee. (Complaint ¶ 50). Thus, a reasonable inference can be drawn that Vector purposefully

influenced Tidel to exclude Plaintiffs from the business opportunity identified by Plaintiffs in order to avoid paying Plaintiffs any compensation.  Indeed, once Vector purchased Tidel, it owned the majority of the company, ensconced a Vector partner and officer on the Tidel Board of Directors and effectively controlled Tidel.  Since Vector had already told Plaintiffs that Vector was not going to compensate Plaintiffs, it is reasonable to infer that Vector purposefully procured Tidel's exclusion of Plaintiffs from the transaction.  These allegations properly plead the necessary factual underpinnings to support a claim for tortious interference with contract.

Defendant argues that Plaintiffs fail to allege that but for Vector's interference Tidel would not have breached the parties' agreement.  Defendant is wrong.  Again, the Complaint alleges that Tidel told Plaintiffs that they had earned their fees, while Vector insisted Plaintiffs would not be paid.  Thus, but for Defendant's interference, Tidel would have included Plaintiffs in the transaction.

Defendant also contends that there can be no tortious interference with contract claim because Plaintiffs have not alleged any agreement with Tidel or Vector under which Tidel or Vector was obligated to pay a fee to Plaintiffs in connection with the Tidel-Vector transaction. Defendant bases its argument on an erroneous, tortured interpretation of Tidel's obligation under the agreement it signed with Plaintiffs, and would render the clear language of that agreement meaningless.  The Complaint pleads that Plaintiffs' agreement with Tidel prohibited Tidel from excluding Plaintiffs from *any business opportunity identified by Plaintiffs* – not just a Tidel-Treasurer-Vector transaction. (Complaint ¶¶ 36, 47, 84).  Plaintiffs allege that they identified and brought about the carve-out of Tidel's Sentinel line from the rest of Tidel's product lines for purchase by Vector (Complaint ¶¶ 40-42, 50), that Tidel and Vector concluded that carve-out transaction as a result of Plaintiffs' efforts (Complaint ¶¶ 53-54), and that Tidel excluded

Plaintiffs from the transaction. (Complaint ¶¶ 86-87). These allegations properly plead a plausible claim and Defendant's motion to dismiss the tortious interference with contract claim should be denied.

### H.   Windsor is a Proper Party Plaintiff

Defendant argues that Windsor is not a party to either NDA involved in this case and, therefore, cannot maintain any claim against Defendant in the action. Defendant is wrong. First, with respect to the written contract based causes of action (Counts 1, 2, 4 and 6), the NDA with both the Defendant and Tidel specify that it is entered into by Goodrich Capital on behalf of itself "together with its affiliates." Indeed, "Goodrich" is defined in both NDA's to include its affiliates. The Complaint alleges that Windsor is an affiliate of Goodrich Capital. (Complaint ¶ 9). Therefore, Windsor is an intended beneficiary of the NDA, or it is reasonable to infer it is, and a proper party to assert contract claims under the NDA with both Defendant and Tidel. Where an agreement includes affiliates within a party's description, there is at a minimum an ambiguity as to whether the affiliate is a party to or has rights under the agreement such that it cannot be determined as a matter of law on a motion to dismiss. *Underdog Trucking, LLC v. Verizon Serv. Corp.*, 2010 U.S. Dist. LEXIS 72642, at *10-13 (S.D.N.Y. July 20, 2010).

With respect to Count 5 seeking restitution for unjust enrichment, the essence of the claim is based on an implied-in-fact contract where one party enriches another and equity and good conscience– not an express contract – require that the party be compensated. The Complaint repeatedly alleges that both Plaintiffs prepared and shared their skills, labor, expenditures, ideas, documents and other work product with Defendant, which Defendant requested and used for its benefit in concluding its transaction with Tidel, and for which both Plaintiffs, including Windsor, should be compensated. Indeed, where, as here, there is a

relationship between the parties that caused or induced reliance, a claim for unjust enrichment lies. *Barbagallo v. Marcum LLP*, 2011 U.S. Dist. LEXIS 123530 at *33 (E.D.N.Y. Oct. 25, 2011). Thus, it is proper for Windsor to assert a claim for unjust enrichment.

Similarly, with respect to the tort claim for unfair competition, the general rule under New York law is that a party asserting an unfair competition claim need only have a colorable property or pecuniary interest in the property at issue in order to state a claim. *Berni v. Int'l Gourmet Rest. of Amer., Inc.*, 838 F.2d 642, 648 (2d Cir. 1988); *Faiveley Transport USA, Inc. v. Wabtec Corp.*, 2011 U.S. Dist. LEXIS 52945 at * 27 (S.D.N.Y. May 13, 2011). As set forth above, Windsor is an affiliate of Goodrich Capital and Goodrich Capital affiliates are included within the definition of Goodrich in the NDA. Under the NDA, title to disclosed material remains with the discloser. Thus, material prepared by Windsor as a Goodrich affiliate and shared with Vector pursuant to the NDA remains the property of Windsor. Clearly then, Windsor has a colorable property and pecuniary interest in the confidential work product which Defendant misappropriated, and thus is a proper party to assert an unfair competition claim.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court issue an order denying in its entirety Defendant's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated:  New York, New York          Eastwood, Scandariato & Steinberg
        March 9, 2012

Eric Steinberg (ES9531)

*Attorneys for Plaintiffs*